**STATE of Maine**

v.

**Leland B. PHILBRICK.**

Supreme Judicial Court of Maine.

Argued March 16, 1984.

Decided Aug. 10, 1984.

Wayne S. Moss (orally), Anita M. St. Onge, Rae Ann French, Asst. Attys. Gen., Augusta, for the State.

George F. Wood (orally), Sanford, for defendant.

Before McKUSICK, C.J., and NICHOLS, ROBERTS and VIOLETTE, JJ., and DU-FRESNE, A.R.J.

NICHOLS, Justice.

Following his third jury trial on the same charge of criminal homicide the Defendant, Leland B. Philbrick, was convicted of criminal homicide in the second degree in Superior Court, York County.

We affirm his conviction.

Approximately seven years ago an indictment was returned against the Defendant, alleging that on the night of July 11, 1977, he shot and killed Charles Porterfield with a .44 caliber pistol in Saco. He was charged with criminal homicide in the second degree, 17-A M.R.S.A. § 202(1)(A)(Supp.1976), *repealed and replaced* by P.L. 1977, ch. 510 § 39, effective Oct. 24, 1977.

The Defendant's first trial ended in a conviction, which we vacated on appeal. *State v. Philbrick*, 402 A.2d 59 (Me.1979) [*Philbrick I*]. He was tried and convicted a second time, and for a second time we vacated the conviction. *State v. Philbrick*, 436 A.2d 844 (Me.1981) [*Philbrick II*]. He now appeals from his third conviction, raising issues of search and seizure, self-defense, sufficiency of jury instructions, failure to preserve evidence, admission of prejudicial evidence, voluntariness of confessions, and admissibility of prior testimony. We consider each of these objections *seriatim*.

## I

The facts surrounding the shooting and the Defendant's subsequent arrest sufficiently appear in our previous opinions in this case; we repeat only those facts essential to today's analysis.

Shortly after the alleged homicide, the Defendant flagged down a passing motorist and stated that he believed he had just killed a man. The motorist, David Fleming, observed that the Defendant appeared to have sustained injuries to his hand and head. Fleming took him to the Saco police station. There, the dispatcher called an ambulance for the Defendant, and he was transported to Webber Hospital in Biddeford and thence to the Maine Medical Center in Portland.

The Defendant made inculpatory statements to officers of the Saco and state police departments. Nevertheless the officers continued to question him without giving him *Miranda* warnings. *Philbrick II, supra,* at 847–53.

While at the emergency room of the Maine Medical Center, awaiting surgery for a gunshot wound to his hand, the Defendant was questioned by State Police Officer Roger Letarte. Letarte asked if he could take the Defendant's clothing, and the Defendant replied, "Yes, go ahead." The officer seized the clothes as nurses undressed the Defendant in preparation for surgery. These clothes and the contents thereof, including several expended .44 caliber shells, were admitted in evidence at the Defendant's third trial.

On appeal, the Defendant argues that his consent to the seizure was not voluntary. The State counters, initially, that the Defendant has waived the issue. According to the State, the Defendant failed to make a pre-trial motion to suppress. In 1982 our rules of criminal procedure directed that a motion to suppress "shall be made before trial or hearing unless opportunity therefor did not exist or the defendant was not aware of the grounds for the motion, but

the court in its discretion may entertain the motion at the trial or hearing." M.R. Crim.P. 41(e) (1982).[1]

In fact, on January 25, 1982, the Defendant filed a motion to suppress, inter alia, all evidence taken from his person on July 12, 1977. Although this motion might have been construed to encompass the Defendant's clothing and the contents thereof, the Defendant's counsel specified at the hearing on the motion that it was "limited to the non-voluntariness of statements made by the Defendant." The Defendant now claims that part of the suppression motion dealing with seized property was taken under advisement. However, the record discloses that what the hearing justice took under advisement was a request to return to the Defendant evidence which our Court had previously ordered suppressed. Counsel for the Defendant essentially concedes that, because he erroneously believed that in *Philbrick II* we had already required that the clothing and its contents be suppressed, he failed to seek suppression of these items before trial.

Furthermore, the suppression motion did not state with sufficient particularity the objects that the Defendant sought to suppress or the reason on which the Defendant based his claim that the seizure was illegal. *See State v. Desjardins,* 401 A.2d 165, 169 (1979). Even if the suppression motion could be viewed as adequately raising the issue of whether the seizure of the Defendant's clothes was unconstitutional, the Defendant still waived the issue by not pressing for a hearing thereon before the trial. *See State v. Vose,* 402 A.2d 869 (Me.1979); W. LaFave, *Search and Seizure* § 161 at 475 (1978).

It was during the trial that the Defendant first objected to the admission of the clothes and their contents. The State responded that the Defendant had not raised this issue in a pre-trial motion and had therefore waived it. Nevertheless, the presiding justice held a hearing on this issue in

---

1. *See also* M.R.Crim.P. 41A(b)(1984).

mid-trial, after which he found that the Defendant had voluntarily consented to the seizure of the clothing and its contents and that, therefore, this evidence was admissible.

In *State v. Bishop*, 392 A.2d 20, 23 (Me.1978), we noted that the provision in Rule 41(e) which authorized the presiding justice to entertain a suppression motion at trial "does not permit such action by the presiding justice at will, without his discretion being subject to review for principled exercise." Good cause must be shown to justify such aberrance. *Id.* Where, as here, the record does not indicate that cause was shown below, we limit our inquiry merely to whether the admission of the challenged evidence constituted manifest error. *State v. Taylor* 438 A.2d 1279, 1282 (Me.1982).

Manifest error exists when the record shows that a defendant was deprived by the alleged error of a fundamentally fair trial. *Id.* After a review of the entire record, we find that, if error there was, the admission of the clothing and its contents did not rise to the level of manifest error.

## II

David Fleming testified that the Defendant described the shooting of Porterfield as follows:

> He said that he—the guy made a move towards him like he was a fag, then he hesitated and said, "No, no, no, that ain't right. The guy drew a knife on me. I got the knife away from him, went for my—no. The guy made a move toward me, like he was a fag, hesitated—no, no, no, that ain't right. I drew my knife, he got the knife away from me, I went for my gun in my back pack and I shot him."

Principally on the basis of this testimony, the Defendant requested instructions on self-defense, 17–A M.R.S.A. § 108(2)(A)(1), and sexual self-defense, *id.* § 108(2)(A)(2). The presiding justice declined to instruct on such an issue.

The issue of self-defense is generated for purposes of jury instruction where a defendant meets his "burden of going forward with evidence of such nature and quality as to raise the issue of self-defense and justify a reasonable doubt of guilt if upon the whole evidence the fact finder entertains such a doubt." *State v. Larrivee*, 479 A.2d 347 (Me.1984). Evidence sufficient to generate an issue need not always come from the defendant; it may be presented by one side or the other, or both. *State v. Inman*, 350 A.2d 582, 587 n. 1 (Me.1976).

Sexual self-defense is available when a person reasonably believes deadly force against another is necessary and he reasonably believes that the other person is committing or about to commit a "forcible sex offense." 17–A M.R.S.A. § 108(2)(A)(2). The statements that Porterfield "made a move towards [the Defendant] like he was a fag" are no evidence that Porterfield was committing, or about to commit, a forcible sex offense, as defined anywhere in the Criminal Code. *Cf. Philbrick I, supra* (sexual self-defense instructions required where Defendant testified that the victim fondled Defendant's crotch and "attacked" him).

Neither was the issue of "pure" self-defense generated where the victim himself initiates the attempt to use unlawful, deadly force, 17–A M.R.S.A. § 108(2)(A)(1). The Defendant made two contradictory statements in this regard, but neither of these could support the defense. The statement, "The guy drew a knife on me. I got the knife away from him," implies that the deadly force used in shooting Porterfield was not reasonably necessary. The revised statement, "I drew my knife, he got the knife away from me . . ." suggests that the Defendant was the aggressor. Absent any evidence that the victim, rather than the Defendant, initiated the deadly combat, the Defendant may not avail himself of this defense. *See State v. Millett*, 273 A.2d 504, at 509–10 (Me.1971).

It was not error for the presiding justice to refuse to allow the jury to consider a theory of defense that finds no rational basis in the evidence. *State v. Greenwald*, 454 A.2d 827, 830 (Me.1982).

### III

The vehicle in which the shooting occurred was seized by the State on July 12, 1977. Measurements were taken, tests performed, and photographs taken. The Defendant was provided with his own investigator, ballistics expert, and pathologist to examine the automobile.

At some point after the Defendant's first trial the State relinquished control of the vehicle. The Defendant requested access to it by filing a motion for discovery after his conviction had been vacated. The State produced the automobile, but it had been changed almost beyond recognition. Not only had most signs of the struggle, including bullet holes and blood stains, been erased or altered, but the vehicle had been converted into a stock car. *See Philbrick II, supra*, at 859. The Defendant's resultant motion to dismiss the indictment was denied on June 10, 1982. The trial court ordered the vehicle to be impounded in its then condition. Nevertheless, the vehicle passed into the custody of Mr. Ron Glantz, d/b/a/ Ron's Auto Sale, who destroyed it by putting it through a crusher.[2]

Again before the third trial the Defendant moved for dismissal. A hearing followed, at which the motion was denied and the State offered to make available a "duplicate" vehicle. After obtaining a "reconstruction expert," Professor Charles E. Armentrout of the University of Southern Maine, and examining him on voir dire, the

Defendant "reluctantly" agreed to accept the substitute.

Subsequently the Defendant renewed his motion to dismiss, which motion was again denied. Near the close of the trial, the defense once more examined Professor Armentrout. By way of offer of proof, Armentrout testified that the incident could have been reconstructed to a "considerable" extent with the original vehicle before it was modified and destroyed but that reconstruction was impossible with merely the State's replacement and the photographs of the original.

■ On appeal, the Defendant contends that this failure of the State to preserve the Porterfield automobile deprived him of due process under the federal Constitution.[3] He urges that under *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), the suppression by the prosecution of material evidence favorable to an accused, regardless of good or bad faith, violates due process. *See also United States v. Agurs*, 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976). Here, however, the record nowhere reveals that the automobile itself, as distinguished from the contents thereof, would have been relevant evidence favorable to the Defendant.

■ Significantly, the State appears to have preserved the relevant evidence derived from the Porterfield automobile. It was not obliged to preserve the vehicle itself. A possibility that exculpatory evidence might have been developed if the automobile had still been available at the time of the Defendant's third trial some five years after Porterfield's death does not make out a case for the extreme remedy of dismissal.

---

**2.** Glantz explained, "since I had not heard from the authorities in about one year I thought the car was no longer needed so I disposed of it."

**3.** Because the Defendant does not argue that his state constitutional rights were infringed, we depart from our preferred practice of deciding issues on the basis of our state constitution before we address federal constitutional questions. *See State v. Larrivee*, 479 A.2d 347 (Me.

1984); *State v. Cadman*, 476 A.2d 1148 (Me. 1984). Just as certain considerations of judicial restraint ordinarily impel us to ground a decision on state, rather than federal law, *State v. Cadman, supra*, at 1150, other considerations of judicial restraint lead us to refrain from deciding important state constitutional issues that have been neither briefed nor argued.

## 494

### IV

The Defendant contends that the admission of ten expended .44 caliber shells was improper because their prejudicial effect outweighed their probative value. M.R.Evid. 403. When he objected to the admission of this evidence at trial, the presiding justice ruled that the evidence was relevant and that the danger of unfair prejudice did not outweigh its probative value. Thus, the justice made the appropriate analysis in deciding to overrule the Rule 403 objection. *State v. Forbes*, 445 A.2d 8, 11 (Me.1982).

We review the decision on the Rule 403 objection only for an abuse of discretion. *Id.; see also State v. Smith*, 472 A.2d 948, 949–50 (Me.1984). We find none. The evidence was certainly probative, in that it helped link the Defendant to the shooting and corroborated testimony that he had used a .44 caliber pistol. The Defendant argues that admission of the shells was unfairly prejudicial because it could have given the jury the impression that he was dangerous or "cold-blooded." Nevertheless, the presiding justice was entitled to find that this potential prejudice was slight in comparison with the probative value of the evidence. *Cf. State v. Condon*, 468 A.2d 1348 (Me.1983) (allowing admission of gruesome photographs); *State v. Forbes, supra* (allowing admission of defendant's gun).

### V.

In addition to making several inadmissible inculpatory statements to police officers while in custody, the Defendant made an admission to an ordinary citizen (quoted in full in Part II of this opinion) and a noncustodial admission to a policeman. Both declarations were admitted at trial after a suppression hearing held on June 9, 1982, at which the State and the defense each called a psychiatrist to testify on the issue of voluntariness.

Under the Maine Constitution, a confession is inadmissible unless voluntary. *State v. Mikulewicz*, 462 A.2d 497 (Me.1983); Me. Const. art. I, § 6-A. The State has the burden of proving voluntariness beyond a reasonable doubt. *State v. Collins*, 297 A.2d 620 (Me.1972).

The Defendant contends that the hearing justice did not apply the correct legal standard in determining that the two admissions at issue were voluntary. In *State v. Caouette*, 446 A.2d 1120, 1123 (Me.1982), subsequent to the hearing justice's ruling, our Court held that "in order to find a statement voluntary, it must first be established that it is the result of defendant's exercise of his own free will and rational intellect." At the suppression hearing, on the other hand, the State argued that a statement must be found voluntary unless compelled by an agent of the State. Contrary to the Defendant's contention on appeal, however, there is no indication that the hearing justice adopted the State's erroneous view of the law.

After conceding that the Defendant had undergone a traumatic experience just before making his admissions, the justice nevertheless concluded that, beyond a reasonable doubt, "the statements were not the result of any involuntary or coerced circumstances." The use of the disjunctive suggests that the justice considered possible involuntary circumstances *apart* from coercion. A further indication that the justice applied the proper legal standard is the fact that he was willing to entertain substantial psychiatric testimony relating to the Defendant's ability to exercise his free will at the time of his admissions.

"The trial court's determination will not be disturbed on appeal if there is evidence providing rational support for its conclusion." *State v. Caouette, supra*, 446 A.2d at 1124. The State's expert witness indicated that even if the Defendant has been under stress or in shock, his statements were nevertheless voluntary.[4] *Cf. State v.*

---

4. Although the witness indicated that a wound

may produce a shock reaction, there was no

*Franklin,* 463 A.2d 749, 752 (Me.1983) (evidence of drug and alcohol consumption does not compel fact finder to entertain reasonable doubt as to voluntariness).

## VI

On June 9, 1982, the presiding justice granted the State's motion in limine to admit the Defendant's prior testimony from his first trial. Significantly this testimony was not in fact introduced. Nevertheless, the Defendant argues that the ruling was erroneous and that he was thereby deprived of due process because he was compelled to alter his trial strategy unnecessarily. It is unnecessary for us to decide whether the presiding justice erred in this ruling because if there was error, it was harmless in this circumstance.

The entry will be:

Judgment affirmed.

All concurring.

evidence that the Defendant actually was in shock.