MAINE SUPREME JUDICIAL COURT                    Reporter of Decisions
Decision:     2015 ME 115
Docket:       And-14-336
Argued:       May 12, 2015
Decided:      August 18, 2015

Panel:        SAUFLEY, C.J., and ALEXANDER, MEAD, GORMAN, JABAR, and HJELM, JJ.

## STATE OF MAINE

v.

## CHRISTAL N. GAGNIER

HJELM, J.

[¶1]    Christal N. Gagnier appeals from a judgment of conviction for tampering with a victim (Class B), 17-A M.R.S. § 454(1-B)(A)(1) (2014), aggravated furnishing of scheduled drugs (Class C), 17-A M.R.S. § 1105-C(1)(A)(4) (2014), and endangering the welfare of a child (Class D) 17-A M.R.S. § 554(1)(C) (2014), entered by the trial court (Androscoggin County, *MG Kennedy, J.*) after a jury trial.   Gagnier contends that the court erred by denying her request that it instruct the jury on the statutory defense of duress, 17-A M.R.S. §103-A (2014).   Because the evidence did not generate that defense, we affirm the judgment.

## I.  BACKGROUND

[¶2]    "A defendant is entitled to an instruction [on a defense] when the evidence is sufficient to make the existence of all the facts constituting the defense

a reasonable hypothesis for the factfinder to entertain." *State v. Doyon*, 1999 ME 185, ¶ 7, 745 A.2d 365 (quotation marks omitted). Because the sole issue on appeal is whether the trial court erred in determining that the evidence did not generate the defense of duress, we consider the evidence in the light most favorable to Gagnier. *See State v. Delano*, 2015 ME 18, ¶ 25, 111 A.3d 648; *State v. Tomah*, 1999 ME 109, ¶ 18, 736 A.2d 1047.

[¶3] The basis for Gagnier's argument that she was entitled to a jury instruction on duress is her contention that she committed the crimes because she was fearful of her husband, Michael Gagnier. Much of the evidence on which Gagnier relies consists of her own trial testimony.[1]

[¶4] Gagnier testified that Michael, who had been an acquaintance of her mother, began to sexually assault her when she was twelve years old. All of them were living out of state at the time. Some time after the assaults began, the relationship between Michael and Gagnier's mother became intimate. Soon after, B.G., Michael's then-three-year-old daughter from another relationship, came to live with Gagnier, Gagnier's mother and Michael.

[¶5] In 2007, when Gagnier was nineteen, Gagnier's mother accused her of "stealing her men" and locked Gagnier in her room, allowing her to leave only for school and work. When Gagnier called Michael for help, he and Gagnier's mother

---

[1] The State contested much of this evidence at trial.

fought and the mother left. Gagnier saw her mother again three months later but has not had any contact with her since then. Gagnier married Michael later that year because "he had always been there to save [her]" and she thought he loved her. They had two children and in 2009 moved to Maine.

[¶6] After they were married, Michael became increasingly angry, which frightened Gagnier. He showed signs of delusions and carried a firearm because he thought "people were coming." Gagnier did not disclose Michael's escalating conduct to others because she was afraid of how he would react. Michael's family pressured Gagnier to seek his involuntary commitment. She initially resisted these efforts, believing that if she upset him, she "would be punished severely for it," but eventually, Michael was involuntarily committed for one month. After he was discharged and eventually returned home, he began to regularly sexually assault B.G. and physically assaulted her in the guise of punishment. Michael also physically and sexually abused Gagnier. He hit her; struck her with a belt, leaving welts; threatened her verbally; once fired a pellet gun near her head; and regularly choked her, which often prompted her to feign a loss of consciousness because she was afraid he would kill her. He also told Gagnier and B.G. that he had people on the street and at school watching them. Because Gagnier was afraid of Michael, she did not call the police.

4

[¶7]  In June 2012, B.G. disclosed Michael's abuse of her to a friend, who then told Gagnier that a report had been made to the Department of Health and Human Services.  When Gagnier told Michael about the report, he became infuriated: he began crying and choked Gagnier, telling her that he and Gagnier were in this together and that she should not say anything to officials.  Michael went into another room, from which Gagnier heard Michael yell at B.G.  Michael ordered Gagnier and B.G. to give DHHS officials a false explanation about why someone would lie to them.  DHHS caseworkers arrived at the residence later that day, but Gagnier did not disclose Michael's sexual abuse of B.G. because she was terrified of Michael.

[¶8]  Later in 2012, Gagnier tested positive for chlamydia and received a prescription for azithromycin, a schedule Z drug, *see* 17-A M.R.S. § 1102(4)(A) (2014), to treat the disease.  B.G. developed symptoms similar to Gagnier's.  Michael and B.G. led Gagnier to believe that B.G.'s condition was the result of sexual contact with a third person.  Michael would not allow Gagnier to take B.G. to a hospital for treatment, and so Gagnier gave B.G. some of her own chlamydia medication.  Gagnier testified that this was her own idea, but a detective testified that Gagnier told him that Michael directed her to provide the medication to B.G.

[¶9]  In February 2013, B.G. again disclosed Michael's sexual abuse, this time to the leader of a church retreat she attended.  After she returned home, a

social worker and a detective came to the residence, and B.G. told them about the abuse. While at the residence, DHHS officials collaborated with Gagnier to create a safety plan for herself, B.G., and her children. Michael was arrested and later confessed to his criminal conduct.

[¶10] While Michael was in custody and unable to make bail, he told Gagnier that he would not be in jail very long. He also told her to tell B.G. not to make statements that would incriminate him. Gagnier believed that if she did not relay Michael's message to B.G., he would "get [her]" when he was released. While Michael was being held in jail, Gagnier drove B.G. to an interview with investigators, and she told B.G. that Michael loved her and that she should not be too hard on him.

[¶11] In June 2013, Gagnier was indicted for (1) tampering with a victim (Class B), 17-A M.R.S. § 454(1-B)(A)(1); (2) aggravated furnishing of scheduled drugs (Class C), 17-A M.R.S. § 1105-C(1)(A)(4); and (3) endangering the welfare of a child (Class D), 17-A M.R.S. § 554(1)(C). A two-day jury trial was held in March 2014. During the trial, Gagnier requested that the court instruct the jury on the defense of duress for all three counts. The court denied the request, determining that despite evidence of an abusive relationship, "there [was] not sufficient evidence to suggest that [Gagnier] could not have gotten out of" the situation because she had many opportunities to report the abuse or seek help.

6

After the court completed its instructions and gave counsel the opportunity to make any objections, *see* M.R. Crim. P. 30(b), both parties stated that they were satisfied with the court's charge.

[¶12] The jury returned guilty verdicts on all three counts. After a sentencing hearing held in June 2014, the court sentenced Gagnier on the tampering charge to a prison term of seven years, with all but three years suspended, and three years of probation. The court imposed concurrent sentences of one year and a $400 fine on the charge of furnishing scheduled drugs and 364 days on the child endangerment charge. Gagnier timely appealed pursuant to 15 M.R.S. § 2115 (2014) and M.R. App. P. 2(b)(2)(A).

## II. DISCUSSION

[¶13] Gagnier argues that the evidence generated a defense of duress pursuant to section 103-A and that the court therefore erred in failing to instruct the jury on that issue. We review the record in the light most favorable to Gagnier, *see Delano*, 2015 ME 18, ¶ 25, 111 A.3d 648, to determine if it would have allowed the jury to find facts to make duress a "reasonable hypothesis." *Doyon*, 1999 ME 185, ¶ 7, 745 A.2d 365. "Whether a jury should be instructed on a particular defense in a criminal case almost always depends on whether the evidence presented at trial generates the defense." *State v. Neild*, 2006 ME 91, ¶ 9, 903 A.2d 339 (quotation marks omitted). Duress is a defense but not an

affirmative defense, which means that when it is generated by the evidence, the State bears the burden of negating it beyond a reasonable doubt. *State v. Glidden*, 487 A.2d 642, 644 (Me. 1985). Because of this statutory framework, when the evidence generates the issue of duress, a court commits error by denying a request to instruct the jury on that defense.[2] *See Tomah*, 1999 ME 109, ¶ 18, 736 A.2d 1047.

[¶14] When we view the evidence relevant to Gagnier's claim in the light most favorable to her, as we must do here, and if Gagnier's version of the facts is true, Michael's conduct toward her and B.G. was horrible. In a jury trial, however, it is not the function of either the trial court or an appellate court to assess the credibility of that evidence and decide as a factual matter whether it is true. Rather, the narrow question presented on this appeal is whether that evidence, which we assume to be true for purposes of this analysis, would allow the jury to conclude that the defendant committed the specific criminal acts at issue as a result

---

[2] We assume, without deciding the issue, that Gagnier has preserved her argument for appellate review. When the court finished its instructions to the jury and gave the parties an opportunity to object, *see* M.R. Crim. P. 30(b), Gagnier told the court that she was satisfied with the instructions. We have held that a party preserves a challenge to the omission of a jury instruction, even without renewing an objection at the conclusion of the instructions, when the party previously requested the instruction but the court definitively denied it. *State v. Dumond*, 2000 ME 95, ¶ 10, 751 A.2d 1014. Here, in contrast, although Gagnier had requested the duress instruction and the court ruled that it would not instruct the jury on the law of duress, Gagnier affirmatively stated that she agreed with the instructions as the court presented them to the jury. We conclude that the court's instructions were not erroneous even if Gagnier properly preserved the issue, and so we need not determine whether Gagnier's earlier request for the instruction was sufficient to preserve her challenge when she subsequently acquiesced to the instructions that did not include the issue of duress.

of "duress," as measured against the specific terms of the statutory definition and explained by our case law.

[¶15]  The Legislature has defined the defense of duress as follows:

**1.** It is a defense that, when a person engages in conduct that would otherwise constitute a crime, the person is compelled to do so by threat of imminent death or serious bodily injury to that person or another person or because that person was compelled to do so by force.

**2.** For purposes of this section, compulsion exists only if the force, threat or circumstances are such as would have prevented a reasonable person in the defendant's situation from resisting the pressure.

. . . .

17-A M.R.S. § 103-A.

[¶16]  When the basis for a duress defense is a threat, that threat "must be real and specific, and the specific harm that is feared must be imminent." *Tomah*, 1999 ME 109, ¶ 19, 736 A.2d 1047.  For threatening conduct to be imminent, it must be "ready to take place, near at hand, impending, hanging threateningly over one's head, menacingly near." *State v. Larrivee*, 479 A.2d 347, 349, 351 (Me. 1984) (holding that a duress defense was not generated when the defendant was told that he would be "very sorry" if he did not commit the robbery).  In contrast, "[a] veiled threat of future unspecified harm is not sufficient to raise the defense of duress." *Tomah*, 1999 ME 109, ¶ 19, 736 A.2d 1047 (quotation marks omitted).  Similarly, the threatened harm is not "imminent" when the threatened

person has "the opportunity to escape that [threatened] harm" or "to seek help or to report [the] threat to the authorities." *Larrivee*, 479 A.2d at 351. Further, the effect of the threat must be viewed objectively, such that under section 103-A(2), it "would have prevented a reasonable person in the defendant's situation from resisting the pressure" arising from the threat. 17-A M.R.S. § 103-A(2); *see Tomah*, 1999 ME 109, ¶ 18, 736 A.2d 1047; *Glidden*, 487 A.2d at 645.

[¶17] Against these legal standards, we consider each charge to determine whether the evidence generated a defense of duress for any of them.

A. Tampering with a Victim

[¶18] The State alleged that Gagnier committed the crime of tampering with a witness[3] when, while Michael was incarcerated, she encouraged B.G. to lie to authorities. Gagnier argues that she did so because Michael told her to convey that message to B.G. and that because of Michael's history of violence and abusive behavior, she perceived that she would be in danger if she did not comply. When Gagnier reportedly told B.G. not to be "hard" on Michael, however, Michael was in jail and did not have immediate access to Gagnier to carry out any threat. The evidence therefore is insufficient to support a reasonable hypothesis that Gagnier was faced with an "imminent" threat if she refused to convey Michael's message to

---

[3] Pursuant to 17-A M.R.S. § 454(1-B)(A)(1) (2014), "[a] person is guilty of tampering with a victim if, believing that an official proceeding . . . or an official criminal investigation is pending or will be instituted, the actor . . . [i]nduces or otherwise causes, or attempts to induce or cause, a victim . . . [t]o testify or inform falsely."

B.G. Rather, at most, Michael's statement to her constituted a "veiled threat of future unspecified harm" that, pursuant to *Tomah*, is legally insufficient to invoke duress as a defense. 1999 ME 109, ¶ 19, 736 A.2d 1047 (quotation marks omitted). Pursuant to *Larrivee,* 479 A.2d at 350-51, this forecloses the availability of the duress defense on the tampering charge.

[¶19] We have long recognized that in cases involving domestic violence and abuse, competent evidence may be presented to explain the nature of an abused person's perceptions of danger posed by an abusive partner. For example, in *State v. Anaya*, the defendant, charged with murder for the death of her abusive domestic partner, raised issues of self-defense and provocation. 438 A.2d 892, 893-94 (Me. 1981). There, the evidence recounted a history of violence inflicted by the decedent on the defendant, and specific evidence was presented that on the night of the homicide, the couple argued, and the decedent "pushed the defendant around." *Id*. at 893. We held that in light of that evidence, the court erred by excluding expert testimony of "battered wife syndrome" to show that "abused women often continue to live with their abusers even though beatings continue, and that a certain substrata of abused women perceive suicide and/or homicide to be the only solutions to their problems." *Id*. at 894.

[¶20] Gagnier argues here, as she did in the trial court, that the pattern of physical abuse inflicted on her by Michael created a context in which her

apprehension of danger was heightened and that she felt compelled to comply with Michael's instruction.[4]   Even in such circumstances, however, section 103-A requires a defendant who seeks to invoke the duress defense to produce some evidence that the threat in fact is imminent.  Therefore, although Gagnier presented evidence of long-standing abuse that Michael perpetrated against her, the evidence nonetheless must be sufficient to allow a finding that she was faced with an actual threat of imminent harm originating with Michael, which irresistibly caused her to encourage B.G. to lie to investigators.  No evidence of such a threat was presented during the trial, and the court therefore did not err in refusing to instruct the jury to consider duress as a defense to the tampering charge.

B.    Aggravated Furnishing of Scheduled Drugs

[¶21]  The charge of aggravated furnishing of scheduled drugs arose from evidence that Gagnier provided her prescription medication to B.G.[5]  Gagnier argues that she was entitled to a duress instruction based on evidence that when she provided her medication to B.G., she acted under duress because Michael would

---

[4]  Gagnier did not offer expert testimony.  Because there is no evidence that any threat posed by Michael was an imminent one, this case is not an occasion for us to consider the extent to which expert testimony, such as that offered in *State v. Anaya*, 438 A.2d 892, 893-94 (Me. 1981), may be necessary for a defendant to make a factual argument about the psychological effects of domestic abuse.

[5]  Pursuant to 17-A M.R.S. § 1105-C(1)(A)(4) (2014), "[a] person is guilty of aggravated furnishing of a scheduled drug if the person violates section 1106 and . . . furnishes a scheduled drug to a child who is in fact less than 18 years of age and the drug is . . . [a] schedule Z drug."  The drug at issue here, azithromycin, is a schedule Z drug because it is a prescription drug not included in schedules W, X, or Y. *See* 17-A M.R.S. § 1102(4)(A) (2014).

12

not allow Gagnier to take B.G. to obtain medical treatment and that she therefore chose to provide B.G. with her own prescription drug. A detective testified differently, stating that Gagnier had told him that Michael instructed her to furnish the medication to B.G.[6] Neither account is accompanied by the report of a threat of imminent harm conveyed by Michael, and therefore, on this record, there is no factual basis on which a reasonable fact-finder could conclude that Michael's conduct compelled Gagnier to furnish the prescribed drug to B.G. Therefore, the evidence could not support an argument that Gagnier's conduct resulted from duress within the meaning of section 103-A.

[¶22] Additionally, the evidence could not support a claim that Gagnier had no option but to give her medication to B.G. Because of Michael's employment, Gagnier had the opportunity to take B.G. to the hospital while Michael was working, to notify the school nurse about B.G.'s medical condition, or to tell B.G. to consult with the nurse. Even though Gagnier knew that B.G. might need medical treatment, the evidence established that she had reasonable options other than giving B.G. unprescribed medications. The evidence therefore did not generate a claim based on the provisions of section 103-A that a reasonable person

---

[6] The detective's testimony is actually more favorable to Gagnier's claim that she acted under duress because it attributes Gagnier's decision to Michael. Evidence that bears on a defendant's burden of production to generate a defense may come from any source, *see State v. Millett*, 273 A.2d 504, 508 (Me. 1971), and is viewed in the light most favorable to the defendant, *State v. Tomah*, 1999 ME 109, ¶ 18, 736 A.2d 1047. Consequently, Gagnier is not limited to her own testimony on this point.

in Gagnier's position would have been unable to resist Michael's influence and exercise independent judgment. *See Larrivee*, 479 A.2d at 350-51. Thus, without addressing the availability of other defenses such as competing harms, 17-A M.R.S. § 103 (2014), we conclude that Gagnier was not entitled to a jury instruction on the law of duress for the charge of furnishing scheduled drugs.

C.      Endangering the Welfare of a Child

[¶23] The availability of a duress instruction on the charge of endangering the welfare of a child requires consideration of the factual basis for the charge.[7] The indictment alleges that Gagnier committed this crime "on or about between" August 24 and 28, 2012. These are the same alleged offense dates accompanying the drug charge, which suggests that the State's theory is that Gagnier endangered B.G.'s welfare by illegally providing her with prescription medication. In fact, the State argued this theory at trial, and during her closing argument, Gagnier herself contended that the two charges were predicated on the same evidence. To the extent that the evidence supporting the child endangerment charge is co-extensive with the drug furnishing charge, the evidence did not generate a duress defense for the same reasons that it was not generated as to the drug charge.

---

7  Pursuant to 17-A M.R.S. § 554(1)(C) (2014), "[a] person is guilty of endangering the welfare of a child if that person . . . [o]therwise recklessly endangers the health, safety or welfare of a child under 16 years of age by violating a duty of care or protection."

14

[¶24]  In addition to pressing its theory that furnishing drugs was a form of criminal endangerment, however, the State took a broader view of the endangerment charge both in its argument to the court that Gagnier was not entitled to a duress instruction and in its closing argument to the jury.  In both contexts, the State more generally argued, at least implicitly, that Gagnier had a duty to protect B.G. from Michael's abusive conduct.[8]  The State was not foreclosed from arguing that theory of guilt, because even though the dates of the endangering conduct, which were not specified in the charge, were the same as those for the drug charge, the State is entitled to prove that a crime occurred anytime within the dates suggested by the evidence, subject here only to the three-year statute of limitations that applies to a class D crime.  *See* 17-A M.R.S. § 8(2)(B) (2014); *State v. Woodard*, 2013 ME 36, ¶ 27, 68 A.3d 1250.  This allowed the State to ask the jury to find Gagnier guilty of child endangerment based on conduct other than providing a prescription drug to B.G., thereby presenting a theory that the endangering conduct encompassed, for example, Gagnier's failure to alert others in some way to Michael's abuse of B.G.

---

[8]  For example, during the colloquy with the court about the duress instruction, the State said, "I think the State would be arguing that [Gagnier] had a duty to protect the child in all kinds of ways that she didn't do during that time period."  To the jury, the State argued that Gagnier "is responsible for giving drugs to that child and she is responsible for not exercising and taking care of [B.G.] when she had a duty of care to protect this child, she made those decisions, and not only did she not act, she purposely acted to make the situation worse."

[¶25]  For the duress defense to be generated by this broader factual view of the endangering conduct, the evidence must have allowed a reasonable jury to conclude that during the entire time she was subject to a duty to protect B.G., Gagnier was *never* free from a threat of imminent serious bodily injury or death posed by Michael that induced her inaction.  Putting it conversely, the duress defense was not generated if, looking at the entire period of time when she knew that Michael was abusing B.G., Gagnier indisputably had even one opportunity to take steps to protect B.G.'s health, safety, or welfare—just as B.G. herself twice reported her own victimization.

[¶26]  The record is not sufficient to have allowed a fact-finder to conclude that Gagnier was subject to a threat of imminent harm at all times when she otherwise had at least one opportunity to seek protection or help for B.G.  The evidence showed, for example, that Michael worked regularly and that there were times when he would briefly stop at home after work but then leave for the night.  Occasionally he did not stop at home and sometimes was out until as late as 5:00 a.m.  Also, Gagnier regularly attended doctor's appointments and took classes three or four days each week.  Thus, although, as the trial court recognized, there is evidence that Gagnier was engaged in an abusive relationship and harbored a generalized fear of Michael, the evidence does not generate a factual contention that Gagnier was deprived of her free will at every moment.  The defense of duress

is narrowly drawn and requires production of evidence of specific threats of impending harm that is of substantial magnitude, rather than generalized fear, as well as the absence of any reasonable opportunity to resist, escape, or seek help. Here, the evidence did not generate that defense on a broadly-viewed theory of child endangerment.

## III. CONCLUSION

[¶27]   Viewing the evidence in the light most favorable to Gagnier, we conclude that the jury could not have found facts necessary to find that her conduct was the product of duress within the meaning of section 103-A.   The court therefore did not err in declining to instruct the jury on that statutory defense as to any of the three charges.

The entry is:

Judgment affirmed.

**On the briefs:**

George A. Hess, Esq., Lewiston, for appellant Christal N. Gagnier

Norman R. Croteau, District Attorney, and Lisa R. Bogue, Asst. Dist. Atty., Auburn, for appellee State of Maine

**At oral argument:**

George A. Hess, Esq., for appellant Christal N. Gagnier

Lisa R. Bogue, Asst. Dist. Atty., for appellee State of Maine

Androscoggin County Superior Court docket number CR-2013-638
FOR CLERK REFERENCE ONLY